## Haas Appeal.

Argued April 17, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Richard Alan Weinstein*, with him *Abraham J. Glick*, for appellant.

*Harry F. Swanger*, with him *Thomas N. Kiehnoff*, amicus curiae.

*John M. Duff*, Deputy Attorney General, with him *Thomas F. Halloran*, Assistant Attorney General, and *Robert P. Kane*, Attorney General, for appellee.

OPINION BY HOFFMAN, J., May 14, 1975:

Appellant contends that the juvenile court erred in sentencing her, upon adjudication of delinquency, to the State Correctional Institution at Muncy, rather than to an institution designed to receive and treat juvenile delinquents.

Appellant was born on August 14, 1958, and was sixteen years old at the time that she was most recently adjudicated delinquent. Her involvement with the juvenile justice system apparently began on June 8, 1972, at the age of thirteen, when her mother brought her to a juvenile detention home because she was incorrigible, habitually stayed out all night, and on one occasion left home for two weeks. This matter was handled informally. Shortly thereafter, the appellant left home and hitchhiked to Maumee, Ohio, with another girl. She was arrested in

Ohio, and her mother brought her back to Pittsburgh. Appellant was taken to the juvenile detention home, and again released without formal court action.

On September 28, 1972, appellant's mother filed the first formal delinquency petition, charging that appellant was incorrigible, a runaway, and used dangerous drugs. A hearing was scheduled for October 17, 1972, but appellant ran away in the interim and did not appear. Appellant was apprehended in Philadelphia, in a motel room with an adult male, on or about November 18, 1972. A second petition was filed on November 28, 1972. On November 30, appellant was, for the first time, adjudicated delinquent and committed to the Youth Development Center at Waynesburg. Appellant was released from Waynesburg on September 24, 1974, and placed on probation until March 25, 1975, in the custody of her mother.

On December 19, 1974, the appellant was arrested in Pittsburgh for soliciting a detective for prostitution and oral sodomy. After hearing, the lower court on February 4, 1975, adjudicated appellant delinquent and committed her to the State Correctional Institution at Muncy. By letter of February 6, 1975, the Office of the Attorney General advised the lower court that Muncy was an inappropriate place of commitment for a delinquent, as there is no facility at that prison for juveniles, and asked that the lower court modify its order. Appellant's attorney also filed a petition to vacate the order committing the appellant to Muncy. On February 10, 1975, the lower court denied this petition. The court also issued a rule against Bernard Malone, the superintendent of Muncy, to show cause why he should not be held in contempt of court for failing to accept appellant as an inmate at Muncy, and to provide a "separate facility" for her. From the order of February 4, and February 10, 1975, this appeal followed. As the Attorney General and the attorney for appellant agree that commitment of a juvenile delinquent to Muncy is illegal, both parties ask our Court to reverse the lower court's order.

The disposition of this case is governed by the Juvenile Act, §25, 11 P.S. §50-322,[1] which provides in relevant part that "[i]f the child is found to be a delinquent child the court may make any of the following orders of disposition best suited to his treatment, supervision, rehabilitation, and welfare: . . .

(3) Committing the child to an institution, youth development center, camp, or other facility for delinquent children operated under the direction or supervision of the court or other public authority and approved by the Department of Public Welfare.

(4) Committing the child to an institution operated by the Department of Public Welfare or special facility for children operated by the Department of Justice."

This provision must be read together with §27 (a) of the Juvenile Act, 11 P.S. §50-324(a), which provides that "[a] child shall not be committed or transferred to a penal institution or other facility used primarily for the execution of sentences of adults convicted of a crime, unless there is no other appropriate facility available, in which case the child shall be kept separate and apart from such adults at all times."

No argument has been made that Muncy is an institution or facility for delinquent children approved by the Department of Public Welfare. Muncy is a penitentiary operated by the Department of Justice, and it has no special facility for children.

Nevertheless, the lower court interpreted our decision in *Commonwealth ex rel. Parker v. Patton*, 225 Pa. Superior Ct. 217, 310 A.2d 414 (1973), as allowing a court to commit a juvenile to a prison for adults, at the same time ordering the prison authorities on pain of contempt to create a "separate facility" at that prison. It is thus necessary to consider the intent of our Court in deciding

---

1. Act of December 6, 1972, P.L. 1464, No. 333, §25, effective in 60 days.

*Parker* to determine whether the lower court erred in attempting to extend its holding to the instant case.

*Parker* dealt with the special situation prevailing at the State Correctional Institution at Camp Hill. The institution at Camp Hill has long been recognized as a special place of confinement and rehabilitation for younger male prisoners. Thus, the Act of June 8, 1881, P.L. 63, §8, 61 P.S. §482, provided that "[t]he said board of managers [of Camp Hill] shall receive and take into said reformatory all male criminals, between the ages of fifteen and twenty-five, and not known to have been previously sentenced to a penitentiary or state prison in this or any other state, who shall be legally sentenced to said reformatory, on conviction of any criminal offense in any court having jurisdiction thereof; and any such court may, in its discretion, sentence to said reformatory any such male person, convicted of a crime punishable by the laws of the state by imprisonment in the penitentiary, between the ages of fifteen and twenty-five as aforesaid; . . . ."

Nevertheless, until recent years, the Camp Hill population included a mixture of young criminal and delinquents. A dissenting opinion in our Court then drew attention to this undesirable situation, pointing out that "Camp Hill is not a camp. Rather it is a maximum security prison designed to house hardened and dangerous, albeit young, criminals. Consequently, the institution is characterized by a grim and restrictive atmosphere which is usually associated with such institutions. . . . [J]uveniles of 16 years of age share common quarters with criminals of up to 25 years of age who have been committed to the institution by Quarter Sessions Courts. These criminals who constitute thirty-five percent of the prison population act as tutors in crime and in base morality to impressionable teenagers. In these aspects, inmate life at Camp Hill bears a striking resemblance to life in a state penitentiary." *Wilson Appeal*, 214 Pa. Superior Ct. 160, 169-170, 251 A.2d 671 (HOFFMAN, J., dissenting), (1969), reversed, 438 Pa. 425, 264 A. 2d 614 (1970).

In *Commonwealth ex rel. Parker v. Patton,* supra, at 220-221, 310 A. 2d at 416, we noted that "[t]here is no doubt that Camp Hill plays a dual role — one good and one bad. The good is found in the rehabilitation programs for juvenile delinquents and the bad in the intermingling of juveniles and adults convicted of crime. . . . Until the legislature comes to the rescue in this problem by providing for the establishment of separate institutions for each group, we are required to decide how best to accomplish the results intended by the requirements of Section 27. That section provides that where there are no other appropriate facilities available, a child should be kept separate and apart from such adults at all times, (contemplating thereby that juveniles must remain separated from adults while receiving all their needs, such as sleeping, resting, recreation, academic and vocational training). Therefore, in the absence of separate institutions for juvenile delinquents and adult criminals we direct Camp Hill Authorities to provide separate facilities for the needs of the two groups, or to provide for the separate use of the same facilities avoiding at all times any intermingling of the two groups." (Footnote omitted.) See also *Commonwealth ex rel. Peterson v. Patton,* 230 Pa. Superior Ct. 6, 326 A. 2d 444 (1974).

It is therefore clear that our decision allowing the joint use of Camp Hill by adult and juvenile inmates rested on three factors: (1) There was no other suitable facility available for the juvenile inmates. (2) The joint use was an interim measure. (3) The juvenile inmates could be kept separate from the adult inmates, and at the same time receive a full recreational, academic, and vocational rehabilitative program.[2]

_____

2. The Pennsylvania Constitution, Article I, §28, provides that "[e]quality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual." The lower court suggests that a juvenile justice system in which male delinquents could be committed to the correc-

All of the factors peculiar to Camp Hill are lacking at Muncy. "Muncy, both under the law and in actual practice, is a state penitentiary. . . . Its title indicates that it is a State Correctional Institution. The women sentenced to Muncy, invariably, are those who have been convicted of the most serious crimes. It is, in fact, the one institution in the state which is designed to accept women convicted of such crimes." *Commonwealth v. Stauffer,* 214 Pa. Superior Ct. 113, 117, 251 A. 2d 718 (1969). On this basis, we held that an adult woman convicted of involuntary manslaughter, the sentence for which was simple

---

tional institution at Camp Hill, but female delinquents could not be committed to the correctional institution at Muncy, would violate this provision.

We recognize that a disproportionate number of youthful male offenders, as compared to female offenders, commit serious crimes of violence. Many of these delinquents are so unruly in behavior and commit such heinous crimes that no existing institution except Camp Hill seems appropriate to house them. Until further intermediate facilities are provided to supplement the present youth development centers, the judges in our juvenile courts who must deal with the most violent of the delinquents will be presented with a problem that is almost impossible to solve satisfactorily.

Nevertheless, it does not appear that the appellant has committed any crime of violence. Her behavior is more of a menace to herself than to fellow inmates, or to the public at large. We therefore cannot say that appellant is comparable to the type of male delinquent who would ordinarily be committed to Camp Hill.

In any case, it appears that the use of Camp Hill as a place of confinement for juvenile delinquents will soon come to an end. By letter of April 14, 1975, Robert P. Kane, Attorney General, has advised Ernest S. Patton, Superintendent of Camp Hill, and the juvenile court judges of the Commonwealth that the Department of Justice "will resist through all lawful channels the placement of any deprived or delinquent child in Camp Hill after August 15, 1975, and that appropriate action will be taken to review the status of juveniles now incarcerated." The Attorney General, in this letter, expresses doubt that under the terms of 61 P.S. §482, supra, the Department of Justice has authority to receive as inmates at Camp Hill persons who have not been found guilty of a crime, but merely adjudicated delinquent.

imprisonment, could not be confined in Muncy. A fortiori, Muncy is an inappropriate place of commitment for a juvenile.[3] It is highly doubtful that a sixteen-year-old girl whose "actions, demeanor and words," in the opinion of the lower court, "point to the sophistication of an adult woman while her emotional and value systems are those of a rebellious and immature child" could benefit in any way from exposure to the most hardened adult female convicts in the Commonwealth.

It appears that the lower court's determination that the appellant could not be placed in a Youth Development Center operated by the Department of Public Welfare was based on the testimony of Susan Davis, who had been appellant's counselor at such an institution. The lower court stated in its opinion that "[t]estimony of [appellant's] counselor, [Miss] Davis, from Youth Development Center, Waynesburg, was to the effect that Susan would be a disruptive influence on the other girls at Waynesburg, she was too sophisticated and progressed far beyond the capacity of the program at Waynesburg, and that it would be an inappropriate placement at this time." Although Miss Davis stated that "initially, her adjustment was very poor, [a] very disruptive influence in the cottage," she noted that "when [appellant] returned to the Center approximately a year ago this spring, she was different. She was genuinely interested in a vocational type of career." Although at one point, Miss Davis indicated that she did not feel that the appellant could benefit further from the program of counseling and rehabilitation at Waynesburg, this statement was apparently based on her belief that appellant needed "intensive counseling." When asked whether placement at Muncy would be detrimental to appellant, Miss Davis stated that "[f]rom what I know of it — from what I know of the

---

3. The Commonwealth's brief indicates that of the current inmate population at Muncy (approximately 200 women and 18 men), 25 inmates are serving life sentences.

program at Muncy, which is very little, I don't know if she would receive any type of therapy." Thus, while Miss Davis's testimony might have indicated that Waynesburg would not be the ideal placement for the appellant, it did not indicate that the Youth Development Center would refuse to accept the appellant, or that Muncy would in any way be a more appropriate placement.

The lower court allowed the appellant to be interviewed by one private institution, which refused to accept the appellant. Although the lower court considered the possibility of placing the appellant at Yoke Crest, it did not attempt to place appellant there. It therefore cannot be said that the lower court considered all possible facilities before deciding to commit the appellant to Muncy.[4]

Nor does it appear that, given the problems posed by the appellant, Muncy would be a more appropriate placement than a youth development center. Despite appellant's history of delinquent behavior, it does not appear that she has ever committed any crime of violence or crime against property. Her delinquency has been limited to incorrigibility, running away, drug use, and acts of sexual promiscuity. The only apparent reason for placing the appellant in a prison rather than in a youth development center is her propensity for escapes. Nevertheless, the Commonwealth has noted in its brief that except for one unit, in which prisoners are locked in their cells almost twenty-four hours a day, "[n]o wall, fence or physical hindrance of any kind surrounds Muncy. . . . Thus an inmate like petitioner Haas with an evident penchant for

---

4. According to an official of the Philadelphia Family Court, the following facilities would be available for a female adjudicated delinquent, in addition to the Youth Development Center at Waynesburg: Youth Development Center, Philadelphia; Sleighton Farms; Simpson Village; Lordsmount; Southern Home (an institution for the emotionally disturbed); and the House of Good Shepherd, Discovery House, and Diagnostic Center. Appellant's brief indicates that at least one facility, the Diagnostic Center, has indicated that it would be willing to receive the appellant.

escape could, if committed as an ordinary member of the population, as readily walk away from Muncy as Haas did from the Youth Development Center in Waynesburg."

Finally, the lower court's commitment of appellant to Muncy, combined with its order to keep her separate from the adult population in a prison where she is the only juvenile delinquent inmate, has placed her in a position where she cannot reasonably participate in any rehabilitative program. Appellant notes in her brief that "[i]n its commendable attempts to separate appellant from the adult population at Muncy, the officials there have had no choice but to place appellant in the hospital ward." Thus, appellant has been placed in a situation amounting almost to solitary confinement.

The State Correctional Institution at Muncy is not an "institution, youth development center, camp, or other facility for delinquents" as contemplated by §25(3) of the Juvenile Act. Nor is it 'an institution operated by the Department of Public Welfare or special facility for children operated by the Department of Justice," as contemplated by §25(4) of the Juvenile Act. Nor can we agree with the lower court that "no other appropriate facility" is available, or even that Muncy would in any case be an "appropriate facility" in which to confine the appellant. The orders committing the appellant to Muncy were therefore contrary to law, and must be vacated.[5]

---

5. We note that the lower court's decision was motivated by an obvious concern for the appellant's future well-being. The problem of appropriate commitment for juvenile delinquents who are both highly vulnerable to corruption by adult criminals, but unwilling to abide by the rules of a typical youth development center, has long troubled the appellate courts of this Commonwealth, as well as the Department of Justice and the juvenile courts. The Attorney General's brief indicates that the Commonwealth plans to construct special facilities for juveniles who must be confined under conditions of higher security than are available at the youth development centers. We hope that when these new facilities become available, the juvenile court judges will no longer confront the dilemma which faced the court below in this case.

The orders of February 4, and February 10, 1975, are vacated. The lower court shall issue an order for the disposition of the appellant consistent with the Juvenile Act, §25, 11 P.S. §50-322, and this opinion.[6]

6. As we find this order of commitment to be contrary to the Juvenile Act, supra, we do not reach the constitutional arguments of the appellant and amicus curiae.